Filed 6/30/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAVE LAFAYETTE TREES et al., | |
| Plaintiffs and Appellants, | A156150 |
| v. | (Contra Costa County Super. Ct. No. MSN1701909) |
| EAST BAY REGIONAL PARK DISTRICT, | |
| Defendant and Respondent; | |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Real Party in Interest and Respondent. | |

Appellants Save Lafayette Trees, Michael Dawson and David Kosters filed an amended petition/complaint seeking to vacate respondent East Bay Regional Park District (EBRPD)'s approval of a memorandum of understanding with respondent Pacific Gas and Electric Company (PG&E) that allows for the removal of 245 trees from EBRPD land. The trial court sustained respondents' demurrers without leave to amend and dismissed the lawsuit.

1

We affirm as the first cause of action seeking relief under the California Environmental Quality Act (CEQA; Pub. Res. Code, §§ 2100 et seq.[1] ) is time-barred and the non-CEQA causes of actions cannot be amended to allege claims for which relief can be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

On review of the order sustaining demurrers, we accept as true all properly pleaded material factual allegations and all materials subject to judicial notice. (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 672.)[2]

---

[1] All further undesignated statutory section references are to the Public Resources Code and the CEQA Guidelines (Cal. Code Regs., tit. 14, §§ 15000 et seq.) are referred to as "Guidelines section . . . ." "Whether the Guidelines are binding regulations is not an issue in this case, and we therefore need not and do not decide that question. At a minimum, however, courts . . . afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2.)

[2] Our factual and procedural background includes portions of the certified public record of the March 17, 2017 proceedings before EBRPD's Board of Directors, of which the trial court took judicial notice.

On appeal, PG&E has filed a request for judicial notice asking us to consider three additional documents directed at addressing certain factual assertions made in appellants' opening brief. We deny PG&E's request for judicial notice as the additional documents are not necessary to resolve this appeal. (See *Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 266, fn. 13 ["[a]s a general matter, judicial notice is not taken of matters irrelevant to the dispositive points on appeal"].)

EBRPD has also filed a request for judicial notice on appeal asking us to consider documents submitted for judicial notice in the trial court (documents 1 through 11) and one document not presented in the trial court (document 12). We grant EBRPD's request for judicial notice of the 11 documents submitted in the trial court and which appear in the appellate appendices, as well as document 12 (Legislative Counsel's Digest of Senate Bill No. 1298 – 1963 amendment to § 5541). (See *Center for Biological Diversity, Inc. v. FPL Group, Inc*. (2008) 166 Cal.App.4th 1349, 1356, fn. 7 [court took judicial notice of fact of proceedings in administrative record, but

## A.    Background

On March 21, 2017, following a public hearing, EBRPD's Board of Directors committed to accept PG&E funding for "[e]nvironmental [r]estoration and [m]aintenance at Briones Regional Park and Lafayette-Moraga Regional Trail."  The staff report prepared in connection with the approved funding explained: "PG&E's Community Pipeline Safety Initiative helps to ensure that PG&E pipelines are operating safely by looking at the area above and around the natural gas transmission lines to be certain that first responders and PG&E emergency response crews have critical access to the pipelines in the event of an emergency or natural disaster.  As part of this initiative, PG&E conducted an in-depth review of trees located up to 14 feet from the gas transmission pipeline on District property in Contra Costa County.  The results of the review were shared with the District and it was determined that a total of 245 trees are located too close to the pipeline and will be removed for safety reasons. [¶] . . . [¶] In consideration of the trees that will be removed for safety reasons, PG&E will provide the District with a payment of $1,000 for each tree that is being removed, for a total payment of $245,000.  PG&E will also provide one replacement tree for each of the 31 District-owned trees within the City of Lafayette, per the City's ordinance.  PG&E will work with the District on appropriate community outreach in advance of the planned safety work.  In addition, PG&E will provide the

did not assume the truth of the statements or opinions]; *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 7, fn. 2 [judicial notice proper for city council resolution]; *People v. Superior Court* (*Ferguson*) (2005) 132 Cal.App.4th 1525, 1532 [legislative history and "Legislative Counsel's Digest" are properly the subject of judicial notice]; Evid. Code, § 452, subds. (b), (d) [judicial notice permissible for "[r]egulations and legislative enactments issued by or under the authority of . . . any public entity in the United States," and for "records of any court" of this state].)

3

District with $10,000 to be used on two years of maintenance related to maintaining pipeline safety at Briones Regional Park."

Following the public hearing on March 21, the Board issued Resolution No. 2017-03-065, passed by motion, authorizing the acceptance of "funding from PG&E's Community Pipeline Safety Initiative for Environmental Restoration and Maintenance at Briones Regional Park and Lafayette-Moraga Regional Trail," as follows:

EAST BAY REGIONAL PARK DISTRICT

RESOLUTION NO.: 2017-03-065

March 21, 2017

AUTHORIZATION TO ACCEPT FUNDING FROM PG&E'S COMMUNITY PIPELINE SAFETY INITIATIVE FOR ENVIRONMENTAL RESTORATION AND MAINTENANCE AT <u>BRIONES REGIONAL PARK AND LAFAYETTE-MORAGA REGIONAL TRAIL</u>

"WHEREAS, PG&E's Community Pipeline Safety Initiative helps to ensure that PG&E['s] pipeline is operating safely by looking at the area above and around the natural gas transmission lines to be certain that first responders and PG&E emergency response crews have critical access to the pipelines in the event of an emergency or natural disaster; and

"WHEREAS, PG&E conducted an in-depth safety review of the pipeline on EBRPD property in Contra Costa County and has identified 245 trees that need to be removed for gas pipeline safety; and

"WHEREAS, the Community Pipeline Safety Initiative will provide funding for tree replacement and maintenance; and

"WHEREAS, District procedures require Board Approval to accept funding; and

"NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors of the East Bay Regional Park District hereby:

"1. Approves the acceptance of funding from PG&E's Community Pipeline Safety Initiative; and

4

"2.  Authorizes and directs the General Manager or Assistant General Manager of Finance and Management Services/CFO, on behalf of the District and in its name, to accept grant funds and execute and deliver such documents including, but not limited to applications, agreements, payment requests and amendments and to do such acts as may be deemed or appropriate to accomplish the intentions of this resolution; and

"BE IT FURTHER RESOLVED, that the Assistant General Manager of Finance and Management Services/CFO or Budget Manager is hereby authorized to amend the current year's budget, without further Board action, upon receipt of the executed contract from the Grants Manager.  The budget amendment will include an increase in budgeted revenue and a corresponding increase in appropriation for the amount stipulated in the contract, including any interest."

Thereafter, on March 22 and 23, 2017, representatives of EBRPD and PG&E signed a memorandum of understanding (MOU) "regarding implementation of the Community Pipeline Safety Initiative on EBRPD property in Contra Costa County."  The MOU stated, in pertinent part:

"**Purpose**

The purpose of this MOU is to establish an agreement between PG&E and EBRPD to guide implementation of the Community Pipeline Safety Initiative, as well as ongoing maintenance and monitoring of the area above the natural gas transmission pipeline, on EBRPD property.

**Proposed Work and Mitigation**

- As part of the Community Pipeline Safety Initiative, PG&E conducted an in-depth review of trees located up to 14 feet from the gas transmission pipeline on EBRPD property.  The results of the review were shared with EBRPD and it was determined that a total of 245 trees are located too close to the pipeline and will be removed for safety reasons.
- PG&E will provide EBRPD with a payment of $1,000 for each tree that is being removed for safety reasons, for a total payment of $245,000.

5

- PG&E will provide one replacement tree for each of the 31 EBRPD-owned trees within the City of Lafayette, per the City's ordinance.
- PG&E will work with EBRPD on appropriate community outreach in advance of the planned safety work.
- PG&E will provide $10,000 to EBRPD to use towards two years of trail maintenance.
- PG&E will provide gas standby personnel to be onsite for all trail maintenance work performed by EBRPD adjacent to the pipeline that involves soil adjustment. . . .

## Ongoing Monitoring and Maintenance

- PG&E will monitor any trees left in place near the pipeline as part of PG&E's ongoing pipeline inspections and patrols. This will include annual foot patrol surveys as well as regular aerial patrols.
- PG&E will notify and coordinate with the Park Supervisor for access to park land for pipeline monitoring and maintenance work in non-emergency situations.
- Should any tree develop into a safety concern or require removal for a critical maintenance project in the future, PG&E will work with EBRPD to address it at that time."[3]

---

[3] In its responsive brief filed February 22, 2021, PG&E informs us that, following the entry of judgment, "PG&E removed 93% of the 245 trees that were the subject of the MOU. Appellants made no effort to seek any type of injunctive relief to preserve the status quo. Only 17 of the relevant trees – all located along the Lafayette-Moraga Regional Trail on EBRPD-owned lands within the City of Lafayette – have not been removed. Those trees are currently subject to a preliminary injunction issued by the Bankruptcy Court (N.D. Cal., S.F. Div.) at the request of the City, prohibiting their removal pending the resolution of ongoing adversary proceedings between the City and PG&E; [a]ppellants are not parties to those proceedings, which involve PG&E's proposed rejection and rescission of a Tree Removal Agreement ("TRA") between it and the City and the TRA's proper interpretation. (Adv. Proc. Nos. 20-03122, 20-03124.)"

We also note appellants filed an action challenging the City of Lafayette's March 27, 2017 approval of a separate "agreement with PG&E

6

On June 27, 2017, EBRPD filed a Notice of Exemption ("NOE") under CEQA in the county clerk's office, announcing that the Board of Directors had reviewed and determined the MOU was not an activity subject to CEQA. It was further determined that "any activity related to the MOU would be categorically exempt" under CEQA, citing to section 21080.23 (Work on Existing Pipelines), and Guidelines sections 15301(b) (Existing Facilities), 15302 (Replacement or Reconstruction), and 15304 (Minor Alterations to Land).

## B.    Trial Court Proceeding

On July 31, 2017, appellants and EBRPD entered into an agreement by which they agreed to "toll all applicable statutes of limitations for 60 days" (hereafter tolling agreement). PG&E did not consent to the tolling agreement.

Within the 60-day tolling period, on September 29, appellants commenced this action by filing a petition/complaint challenging EBRPD's approval of the MOU against EBRPD as respondent/defendant and PG&E as real party in interest. Appellants also filed a proof of service that they had given EBRPD the required mail notice (§ 21167.5[4]) of their intent to file a CEQA action on September 28. The petition/complaint was personally served

---

which authorized and imposed conditions on the removal of up to 272 trees within its local natural gas pipeline rights-of way." (*Save Lafayette Trees v. City of Lafayette* (2019) 32 Cal.App.5th 148, 153.) This court found timely a cause of action alleging violations of CEQA, but dismissed as time-barred the non-CEQA causes of actions. (*Id*. at pp. 155-159, 160-162.)

[4]    Section 21167.5 provides: "Proof of prior service by mail upon the public agency carrying out or approving the project of a written notice of the commencement of any action or proceeding described in Section 21167 identifying the project shall be filed concurrently with the initial pleading in such action or proceeding."

on EBRPD on September 29, and personally served on PG&E's representative on October 2, within 20 days of service on EBRPD.

The first amended petition/complaint, filed March 28, 2018, is the pleading under review on this appeal. The first cause of action alleges EBRPD failed to undertake a CEQA analysis of the potential environmental impact of the removal of trees before approving the MOU (CEQA cause of action). The second cause of action alleges, in pertinent part, that EBRPD's approval of the MOU violated the procedural and substantive requirements of the City of Lafayette Tree Protection Ordinance and EBRPD Ordinance 38. The third cause of action alleges EBRPD violated appellants' state constitutional due process rights by approving the MOU without providing public notice "reasonably calculated to apprise [appellants] and other directly affected persons that hundreds of trees near their properties and along many miles of highly popular public recreational trails would be removed, and their property interests would be thereby affected".[5]

The trial court sustained PG&E's demurrer to the CEQA cause of action without leave to amend based upon its findings that it was time-barred under both the 35-day and 180-day limitations periods set forth in section 21167.[6] The court sustained EBRPD's demurrer to the second and third

---

[5] The amended petition also included a fourth cause of action alleging EBRPD had "proceeded in excess of its authority and abused its discretion" in approving the MOU without compliance, in pertinent part, with CEQA, the City of Lafayette's Municipal Code, EBRPD Ordinance 38, and "the Due Process section of the California Constitution." The trial court sustained EBRPD's demurrer without leave to amend the fourth cause of action on the basis that it was derivative of the other causes of action and "must fall as they fall." Appellants do not seek to reinstate this cause of action.

[6] Section 21167 states, in relevant part: "An action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a

8

causes of action without leave to amend based upon its findings that they did not state causes of action for which relief could be granted and could not be amended to cure any defects.  Following entry of a judgment of dismissal, appellants filed a motion to vacate the judgment that was denied.  Their timely appeal ensued.

**DISCUSSION**

**A.  Legal Framework**

"In our de novo review of an order sustaining a demurrer, we assume the truth of all facts properly pleaded in the complaint or reasonably inferred from the pleading, but not mere contentions, deductions, or conclusions of law.  [Citation.]  We then determine if those facts are sufficient, as a matter of law, to state a cause of action under any legal theory [Citation.] [¶] In making this determination, we also consider facts of which the trial court properly took judicial notice.  [Citation.]  Indeed, a demurrer may be sustained where judicially noticed facts render the pleading defective

---

public agency on the grounds of noncompliance with this division shall be commenced as follows:

"(a) An action or proceeding alleging that a public agency . . . has approved a project that may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment shall be commenced within 180 days from the date of the public decision to carry out or approve the project, or if the project is undertaken without a formal decision by the public agency, within 180 days from the date of the commencement of the project. [¶] . . . [¶]

"(d) An action or proceeding alleging that a public agency has improperly determined that a project is not subject to this division . . . shall be commenced within 35 days from the date of the filing by the public agency . . . of the notice authorized by subdivision (b) of Section 21108 [Notice of Exemption] . . . .  If the notice has not been filed, the action or proceeding shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project, or, if the project is undertaken without formal decision by the public agency, within 180 days from the date of commencement of the project."

9

[citation], and allegations in the pleading may be disregarded if they are contrary to facts judicially noticed." (*Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 751-752 (*Scott*).)

"In order to prevail on appeal from an order sustaining a demurrer, the appellant must affirmatively demonstrate error. Specifically, the appellant must show that the facts pleaded are sufficient to establish every element of a cause of action and overcome all legal grounds on which the trial court sustained the demurrer." (*Scott, supra*, 214 Cal.App.4th at p. 752.)

**B.    Dismissal of CEQA Cause of Action as Time-Barred**

We review de novo the order sustaining PG&E's demurrer to the first cause of action under CEQA. *(Coalition for Clean Air v. City of Visalia* (2012) 209 Cal.App.4th 408, 419-420.) As the CEQA cause of action was properly dismissed as barred by the 180-day limitations period, we do not address the parties' additional arguments concerning the 35-day limitations period.

The trial court found the 180-day limitations period began to run on March 21, 2017, expired on September 18, and, accordingly, the CEQA cause of action was time-barred as the lawsuit was filed "eleven days" late on September 29, 2017. (See *Walton v. Guinn* (1986) 187 Cal.App.3d 1354, 1360 [although "an amended complaint supersedes the original, the time of filing of the original complaint is still the date of commencement of the action for purposes of the statute of limitations"].) While EBRPD agreed to toll the statute of limitations, the trial court properly found the CEQA cause of action was subject to dismissal because PG&E, a necessary and indispensable party to that cause of action, had not consented to the tolling agreement. (*Salmon Protection & Watershed Network v. County of Marin* (2012) 205 Cal.App.4th 195, 204, fn. 6 (*SPAWN*); see Code Civ. Proc., § 389, subd. (b); *County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 36-40 [court upheld

dismissal of the action where petitioners failed to join necessary and indispensable parties before the statute of limitations ran]; but cf. *Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 847-862 [court found CEQA cause of action could proceed in the absence of a necessary *but not* indispensable party].)

### 1. Tolling Agreement Was Not Binding on PG&E

The trial court did not abuse its discretion in finding PG&E a "necessary party" within the meaning of Code of Civil Procedure section 389, subdivision (a), and an " 'indispensable party,' i.e., a party without whom" the CEQA cause of action could not " 'in equity and good conscience' proceed." (*Id.*, subd. (b).) We do not agree with appellants that PG&E, not a signatory to the tolling agreement, was nonetheless bound by the tolling agreement "to the same extent" as EBRPD.

PG&E, as a named party, was entitled to either assert or waive the statute of limitations defense to the amended petition/complaint. (See *Travelers Indemnity Co. v. Bell* (1963) 213 Cal.App.2d 541, 547 [defense of statute of limitations "is a 'personal privilege' to be asserted or waived at the option of the one entitled to assert it"]; *Friends of Shingle Springs Interchange, Inc. v. County of El Dorado* (2011) 200 Cal.App.4th 1470, 1474, 1494-1495 [where appellant filed a petition for writ of mandate challenging certification and approval by county, through its board of supervisors, of a mini-mart and gas station complex, court entertained real party in interest project proponent's demurrer on the basis that appellant did not have legal capacity to file petition].)

In addition, PG&E was a necessary party to the tolling agreement as supported by persuasive dictum in our decision in *SPAWN*, *supra*, 205 Cal.App.4th 195. In *SPAWN*, plaintiff Salmon Protection and Watershed

11

Network (SPAWN) sought to challenge the adequacy of an environmental impact report (EIR) certified in connection with the adoption of a general plan update for the San Geronimo Valley watershed. (*Id*. at 199.) SPAWN and the county entered into a series of tolling agreements extending the 30-day limitations period in section 21167 for the filing of a complaint challenging the sufficiency of the EIR until September 14, 2010, during which time the parties engaged in unsuccessful settlement negotiations. (*Id*. at p. 199.) In March 2011 the court allowed intervention by owners of properties within the affected watershed. (*Id*. at pp. 199, 200.) The complaint in intervention alleged that SPAWN's petition was untimely because the purported agreement tolling the statute of limitations was not permitted under CEQA. (*SPAWN*, *supra*, at p. 199.) The trial court sustained demurrers without leave to amend the complaint in intervention, holding that CEQA did not prohibit tolling agreements. (*SPAWN*, *supra*, at p. 199.) In upholding the trial court's ruling that tolling agreements under CEQA were permissible, we commented:

"Since a party whose project has been approved by a public agency is a real party in interest in a challenge under CEQA to the validity of the approval and must be named as such (§ 21167.6.5, subd. (a)), an agreement to toll the limitation period, to be effective, must have the concurrence of the recipient of the approval that is being challenged. The project proponent, the public agency, and the party asserting noncompliance with CEQA are the three parties that must agree to toll the limitation period. If the project proponent wishes to proceed in accordance with the expedited statutory schedule, presumably believing that approach is most likely to speedily remove the challenge, the proponent need not agree to toll the limitation period. However, if the approval recipient is prepared to extend the date for

12

filing a complaint in the belief that negotiations are more likely to yield a prompt resolution of the dispute and permit the project to proceed, the principal reason for urging haste with litigation disappears." (*SPAWN*, *supra*, 205 Cal.App.4th at p. 204, fns. omitted.)

We went on to hold, however, that in that case the intervenors were *not* necessary parties to an effective tolling agreement because they were not real parties in interest:

"The dispute in the present case differs from the prototypical CEQA controversy concerning the approval of a site-specific project in that the project for which an EIR was prepared here is an amendment to a countywide plan, involving no individual project proponent. Although the intervenors' properties may indirectly be affected by the update to the countywide plan, the interveners are not real parties in interest in litigation challenging its adoption. In granting their motion for intervention (Code Civ. Proc., § 387), the trial court stated that intervenors are 'necessary' parties within the meaning of Code of Civil Procedure section 389, subdivision (a) only because of SPAWN's request for an injunction prohibiting the approval of development projects on their properties, and they are not 'indispensable' parties within the meaning of Code of Civil Procedure section 389, subdivision (b). . . . Section 21167.6.5 subdivision (d) provides explicitly that the failure to name persons other than those who are real parties in interest is not grounds for dismissing the proceedings. Not being real parties in interest, their approval is unnecessary to the entry of an agreement to toll the running of the limitations period." (*SPAWN*, *supra*, at pp. 204-205, fn. omitted.)

The *SPAWN* dictum espouses well-settled law regarding "agreements to extend or waive statute of limitations. Although parties certainly may

13

contract to extend the limitation periods (e.g. *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1547 . . .), it is well established that such an agreement *has no effect on other potential parties not in privity.*" (*FNB Mortgage Corp. v. Pacific General Group* (1999) 76 Cal.App.4th 1116, 1135 (italics added), citing Code Civ. Proc, § 360.5 [a waiver of the statute of limitations is to be "signed by the person obligated"].)

Here, PG&E is clearly a real party in interest. Appellants would have us find that is of no import because, according to appellants, the real party in interest is not a necessary signatory to an effective tolling agreement as the deadlines for filing CEQA lawsuits are governed by an agency's actions – and therefore the agency has the sole power and is the only party necessary to an agreement to toll the statute of limitations. (§§ 21167.6, 21167.6.5.[7]) In

---

[7] Section 21167.6 provides, in pertinent part:

"Notwithstanding any other law, in all actions or proceedings brought pursuant to Section 21167, . . . all of the following apply:

"(a) At the time that the action or proceeding is filed, the plaintiff or petitioner shall file a request that the respondent public agency prepare the record of proceedings relating to the subject of the action or proceeding. The request, together with the complaint or petition, shall be served personally upon the public agency not later than 10 business days from the date that action or proceeding was filed."

Section 21167.6.5 provides, in pertinent part:

"(a) The petitioner or plaintiff shall name, as a real party in interest, the person or persons identified by the public agency in its notice filed pursuant to subdivision (a) or (b) of Section 21108 [Notice of CEQA Determination or Notice of CEQA Exemption], . . . or, if no notice is filed, the person or persons in subdivision (b) or (c) of Section 21065, as reflected in the agency's record of proceedings for the project that is the subject of an action or proceeding brought pursuant to Section 21167, . . ., and shall serve the petition or complaint on that real person in interest, by personal service, mail, facsimile, or any other method permitted by law, not later than 20 business days following the service of the petition or complaint on the public

14

other words, it is appellants' contention that where an agreement between the petitioner and the agency tolls all applicable limitation periods for filing – and subsequent service – of a petition or complaint, all obligations to, or interests and rights of any real party in interest automatically run from that extended tolled deadline under section 21167.6.5. Appellants support their argument by asking us to consider our recognition in *Save Lafayette Trees v. City of Lafayette*, *supra*, 32 Cal.App.5th 148 at page 162, that "CEQA's deadlines for service of CEQA petitions govern[ ] '[n]otwithstanding any other law.' "

Appellants' focus on CEQA's service requirements is of no moment. The " 'propriety' " of timely compliance with the service requirements on a real party in interest "would matter if, and only if, valid service of" the pleading "constituted commencement of an action against" the real party in interest "*for statute of limitations purposes*. [¶] *It did not*." (*Fireman's Fund Ins. Co. v. Sparks Construction, Inc*. (2004) 114 Cal.App.4th 1135, 1144; italics added.) The "notwithstanding any other law" in section 21167.6 governing "service" requirements "can only establish that statute's precedence over other statutes arguably covering the same subject matter;" for example, "[w]hile section 21167.6 sets forth rules for the *time* in which service must be made, it does not purport to govern the *manner*;" and consequently, we would "adhere to the standard rules contained in the Code of Civil Procedure which cover the manner of service." (*Board of Supervisors v. Superior Court* (1994) 23 Cal.App.4th 830, 840, fn. 7.)

Here, we are concerned with the commencement of an action for the purposes of the statute of limitations. Because sections 21167.6 and

---

agency. [¶] . . . [¶] (d) Failure to name potential persons, other than those real parties in interest described in subdivision (a), is not grounds for dismissal pursuant to Section 389 of the Code of Civil Procedure."

21167.6.5 do not provide any specific rules for the "filing" of the petition or complaint that commences a CEQA action, we adhere to the standard rules in the Code of Civil Procedure that govern the commencement of a civil action for the purpose of stopping the running of the statute of limitations. (Code Civ. Proc., §§ 350, 411.10.) Hence, the *filing* of the appropriate pleading in court is the *only* act that "stops the running of the statute" of limitations against a party and the trial court properly recognized that any service requirements were inapplicable to the question at hand. (*Pimental v. City of San Francisco* (1863) 21 Cal. 351, 367; see *Garcia v. Lacey* (2014) 231 Cal.App.4th 402, 411 ["civil actions (such as lawsuits for damages or equitable relief) and special proceedings (such as writ petitions) are commenced when the plaintiff's complaint or petition is filed with the court"].)

The trial court also properly found that the tolling agreement was not effective as it was not agreed to by real party in interest PG&E, a necessary and indispensable party to the CEQA cause of action. The "primary purpose" of the limitation period in section 21167 "is to protect project proponents from extended delay, uncertainty and potential disruption of a project caused by a belated challenge to the validity of the project's authorization." (*SPAWN*, *supra*, 205 Cal.App.4th at p. 205.) CEQA does not statutorily authorize tolling agreements so while the parties can agree to toll any applicable limitations period, *that is not by statutory right*, but by private agreement of the parties and hence pursuant to the terms of any such agreement. Appellants' position that PG&E is not a necessary party to any tolling agreement would in practice defeat the primary purpose of the limitation period (protection from delay and uncertainty) because no settlement agreement could be reached without all necessary parties, including PG&E.

16

**2. CEQA Claim Barred by 180-Day Limitations Period**

Appellants contend that, even in the absence of the tolling agreement, the CEQA cause of action was timely filed as the 180-day limitations period did not start on March 21, 2017 (as found by the trial court) because neither the Board's on-line agenda notice for the March 21, 2017 public hearing or "the accompanying description of the Board Resolution in question mentioned or even implied that *any trees would be removed*" as part of PG&E's funding proposal. Appellants further alleged in their amended petition/complaint that EBRPD purportedly "failed to provide any written notice, by mail, posting, or publication, reasonably calculated to apprise the public . . . of PG&E's proposed removal of trees." Thus, according to appellants, the 180-day limitations period did not commence until they had "constructive notice of the project," which was many weeks after the approval of the MOU. We find these arguments unavailing.

Our Supreme Court has held that when an agency approves a project without filing either a notice of determination (NOD) as to whether a project will have a significant environment impact or a notice of exemption (NOE) as to whether a project is statutorily exempt from CEQA, section 21167 nonetheless "permits a legal challenge to be brought up to 180 days after the agency's decision or commencement of the project," which "is deemed *constructive notice* for potential CEQA claims." (See *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 47 (*Committee for Green Foothills*), italics added; *Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 500 (*Stockton Citizens for Sensible Planning*) [accord].)

Section 21167 does not establish any special notice requirements for the commencement of the 180-day limitations period from project approval.

17

"[A]ll that is required is that the public agency makes a formal decision to 'carry out or approve the project.'" (*Citizens for a Green San Mateo v. San Mateo County Community College Dist.* (2014) 226 Cal.App.4th 1572, 1597.)[8] "The Guidelines define 'approval' as 'the decision by the public agency which commits the agency to a definite course of action in regard to the project intended to be carried out by any person.' (Guidelines, §15352, subd. (a).) The Guidelines continue: 'The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval.' (*Ibid.*)" (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 963 (*County of Amador*).)

The facts in the judicially noticed documents in the record[9] show that, following the public hearing on March 21, 2017, EBRPD was committed to a definite course of action by issuing a resolution authorizing (and directing the execution of an agreement) accepting funding from PG&E for the cost of the tree replacement (following necessary removal of 245 trees) and maintenance

---

[8]     Consequently, we find inapposite appellants' reliance on *Defend Our Waterfront v. State Lands Com.* (2015) 240 Cal.App.4th 570, which addresses the issue of adequacy of public notice for the purposes of determining whether a plaintiff has exhausted his administrative remedies before filing a CEQA lawsuit (*id.* at p. 584).

[9]     "Where, as here, judicial notice is requested of a *legally operative* document, . . . the court may take notice not only of the fact of the document and its recording or publication, but also facts that clearly derive from its *legal effect.* [Citation.] Moreover, whether the fact derives from the legal effect of a document or from a statement within the document, the fact may be judicially noticed where, as here, the fact is not reasonably subject to dispute." (*Scott, supra,* 214 Cal.App.4th at p. 754; italics in original.) To the extent appellants' allegations in the amended petition/complaint are directed at lack of sufficiency of the approval notice we disregard them as being contrary to the judicially noticed facts. (*Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1055.)

18

at Briones Regional Park and Lafayette-Moraga Regional Trail.  The MOU, executed by EBRPD and PG&E on March 22 and 23, 2017, was consistent with the resolution and the project as outlined in the staff report submitted to the Board.  (See *Cumming v. City of San Bernardino Redevelopment Agency* (2002) 101 Cal.App.4th 1229, 1235 ["public record gave sufficient notice to start [CEQA 180-day] statute of limitations running" where the "scope of the . . . project was disclosed in the public documents made available for review before the sale was approved"]; but cf. *County of Amador*, *supra*, 72 Cal.App.4th at pp. 964-965 [the 180-days limitations period did not start to run from project approval because the agency's resolution, which only authorized negotiations, was not an approval of the project].)

Accordingly, the public was given the necessary "constructive notice" that the 180 days started to run from March 21, 2017, the "statutory triggering date" of project approval.  (*Committee for Green Foothills*, *supra*, 48 Cal.4th at p. 47; see *County of Del Norte v. City of Crescent City* (1999) 71 Cal.App.4th 965, 980 [court found date city council held public hearing and enacted policy in the form of a resolution, passed by motion, to be date 180-day limitations period commenced]; *City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713, 1720 [even if the "wording of the NOE . . . was insufficient to start the running of the 35-day limitations period, . . . the broader 180-day limitations period applies . . . because the facts alleged in the City's petition, as read in conjunction with judicially noticeable facts, clearly show that the 'project' (i.e. the agreement) was approved by the County on November 28, 1989 and the actual agreement executed on January 29, 1992 was not substantially different from the original 'project,' " and "[a]ccordingly, the 180-day limitations period began to run on November 28, 1989 and expired 180 days later, barring the City's petition which was not filed until

19

July 22, 1992"].) Our Supreme Court has made clear that any "flaws in a project approval process" do not delay the limitations period normally applicable when, as in the instant case, EBRPD *gave notice of the very approval the [appellants] seek to challenge.*" (*Stockton Citizens for Sensible Planning*, *supra*, at 48 Cal.4th at p. 511; italics in original.)

Nor are we persuaded by appellants' arguments that the action should be deemed timely filed based on the decisions in *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 (*Concerned Citizens of Costa Mesa*) and *Ventura Foothill Neighbors v. County of Ventura* (2014) 232 Cal.App.4th 429 (*Ventura Foothill Neighbors*). Our recitation of the facts in those cases demonstrate they are inapposite. In *Concerned Citizens of Costa Mesa*, the plaintiffs' CEQA challenge for failure to file a supplemental environment impact report ("EIR") was deemed timely because the statutory triggering date for the plaintiffs' action (challenging the project actually constructed – which included an amphitheater – as opposed to what was described in the EIR) was "within 180 days of the time the plaintiff[s] knew or reasonably should have known that the project under way *differs substantially from the one described in the EIR*." (42 Cal.3d at pp. 939-940; italics added.) *Ventura Foothill Neighbors* also concerned a situation where the agency had approved an EIR for a building to be 75 feet tall, but the project proponent later increased the height to 90 feet and the agency gave no notice that the changed project was subject to CEQA or filed an addendum to the EIR, and thus there was no actual notice of the new height until an inquiry was made at the construction site. (232 Cal.App.4th at pp. 432-433.) The plaintiff's challenge to the height change was timely, even though section 21167, subdivision (e) required actions to be filed within 30 days of the decision announced in a filed notice of determination, because the notice of

20

determination had omitted the change in the building's height. (*Id.* at p. 436.) Thus, in both cases the actions were determined to be timely filed because a "statutory triggering date never actually transpired" to start the running of the statute of limitations. (*Communities for a Better Environment v. Bay Area Air Quality Management Dist.* (2016) 1 Cal.App.5th 715, 725.) Here, we are not concerned with an omission similar to what occurred in *Concerned Citizens of Costa Mesa* and *Ventura Foothill Neighbors.* The record shows "a statutory triggering date" – March 20, 2017 – EBRPD's formal decision approving Resolution No. 2017-03-065, authorizing acceptance of PG&E's funding for tree replacement (following the necessary removal of 245 trees) and maintenance at Briones Regional Park and Lafayette-Moraga Regional Trail.

In sum, we conclude the first cause of action under CEQA was properly dismissed, as a matter of law, because the lawsuit was not filed within 180 days of EBRPD's public "decision to carry out or approve the project" under section 21167. Our determination renders moot and accordingly we do not address appellants' additional argument that the agency's NOE failed to provide sufficient notice to trigger CEQA's shorter 35-day limitations period under section 21167, or their argument that the CEQA cause of action is not governed by the shorter 90-day limitations period in Government Code section 65009, which governs land use planning and zoning actions of a city, a county, or a city and county (see *Save Lafayette Trees v. City of Lafayette, supra*, 32 Cal.App.5th at pp. 160-162).

### C. Dismissal of Second Cause of Action

### 1. City of Lafayette Tree Protection Ordinance

The trial court found the second cause of action's allegations that EBRPD's approval of the MOU violated the City of Lafayette Tree Protection

Ordinance could not be sustained because EBRPD's action was authorized by sections 5541 and 5541.1[10], a state law, which preempted the City of

[10]    Section 5541 reads:

"A district may plan, adopt, lay out, plant, develop, and otherwise improve, extend, control, operate, and maintain a system of public parks, playgrounds, golf courses, beaches, trails, natural areas, ecological and open space preserves, parkways, scenic drives, boulevards, and other facilities for public recreation, for the use and enjoyment of all the inhabitants of the district, and it may select, designate, and acquire land, or rights in land, within or without the district, to be used and appropriated for such purposes. It may cause such trails, parkways, scenic drives, and boulevards to be opened, altered, widened, extended, graded or regraded, paved or repaved, planted or replanted, repaired, and otherwise improved, . . ., and may do all other things necessary or convenient to carry out the purposes of this article.

"The board of directors of a district shall not interfere with control of any of the foregoing or other public property, that are existing, owned or controlled by a municipality or county in the district, except with the consent of the governing body of the municipality, or of the county if the same is in unincorporated territory, and upon such terms as may be mutually agreed upon between the board of directors of the district and the governing body."

Section 5541.1 reads: "The East Bay Regional Park District may plan, adopt, lay out, plant, develop, and otherwise improve, extend, control, operate, and maintain vehicular recreational areas and trails for the use and enjoyment of all the inhabitants of the district, and it may select, designate, and acquire land, or rights in land, within or without the district, to be used and appropriated for such purposes. The East Bay Regional Park District may cause such vehicular recreational areas and trails to be opened, altered, widened, extended, graded or regraded, paved or unpaved, planted or replanted, repaired, and otherwise improved.

"The Board of Directors of the East Park Regional Park District shall not interfere with the control of any vehicular recreational area or trail that is existing, owned, or controlled by a municipality or county in the district, except with the consent of the governing body of the municipality, or of the county if the same is in unincorporated territory, and upon such terms as may be mutually agreed upon between the board of directors and the governing body."

Lafayette Tree Protection Ordinance[11], a local ordinance in conflict with a state law. In challenging the trial court's ruling, appellants contend the City of Lafayette Tree Protection Ordinance is not preempted by state law and, therefore, EBRPD is required to comply with it in regard to trees located on district land situated within the geographical boundaries of the City of Lafayette despite EBRPD's broad authority to maintain its land under section 5541[12]. We disagree.

---

[11]    City of Lafayette Tree Protection Ordinance, adopted in 2003 and amended in 2010 and 2014 (Lafayette Mun. Code, chs. 6-17), provides, in pertinent part:

"6-1701 Purpose and Findings

> B.  Findings.  The City Council finds that:
>
>    1.  The policies of the City are to protect existing woodlands and their associated vegetation, protect native trees, preserve riparian habitat, encourage the planting of native species, and avoid the cutting of mature trees.
>    2.  In order to implement these policies and to promote the public health, safety and welfare, it is necessary to protect existing trees and require the replacement of trees that have been destroyed or removed.
>    3.  Protected trees are valuable assets to the City and the community, and the public shall be compensated when a protected tree is destroyed or removed in a manner that is not in compliance with this chapter."

 "6-1703 Destruction of a protected tree

It is a violation of this chapter for any person to remove or destroy a protected tree without a category I or category II permit under section 6-1706 or 6-1707, or without the approval of an exception under section 6-1705."

[12]    While our discussion addresses the preemptive effect of section 5541, it applies equally to the preemptive effect of section 5541.1. For convenience, however, our discussion makes reference only to section 5541.

In *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139 at pages 1149-1150, our Supreme Court set forth the principles of state law preemption as follows:

"The party claiming that general state law preempts a local ordinance has the burden of demonstrating preemption. [Citation.] We have been particularly 'reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another.' [Citation.] . . . [¶] Thus, when local government regulates in an area over which it traditionally has exercised control, such as the location of particular land uses, California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is not preempted by state statute. [Citation.] . . . [¶] Moreover, the 'general principles governing state statutory presumption of local land use regulation are well settled. . . . "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws*." (Cal. Const., art. XI, § 7; italics added [in original].) " 'Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citations].' " ' [Citation.] [¶] Local legislation is 'duplicative' of general law when it is coextensive therewith and 'contradictory' to general law when it is inimical thereto. Local legislation enters an area 'fully occupied' by general law when the Legislature has expressly manifested its intent to fully occupy the area or when it has impliedly done so in light of recognized indicia of intent. [Citation.]" With these principles in mind, we now address the parties' arguments.

"The Legislature first authorized the creation of regional park districts in 1933 'for the purpose of acquiring, improving, and maintaining parks, playgrounds, beaches, parkways, scenic drives, boulevards and other facilities for public recreation.' (Stats. 1933, ch. 1043, p. 2664.) This act was later codified in 1939 as section 5500 et seq. (Stat. 1939, ch. 94, p. 1217 et seq.) and then expanded in 1975 to include regional open space districts as well as combination use districts, called regional park and open space districts (§ 5500, as amended Stats. 1975, ch. 813, § 2, p. 1846). Such districts now . . . stretch from Los Angeles County in the south to Napa and Sonoma Counties in the north. [13] The oldest and most developed district, and the one envisioned by the authors of the original legislation in 1933, is East Bay Regional Park District." (*Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282, 286 (*Ste. Marie*).) As of the filing of the March 29, 2018, amended petition/complaint, EBRPD encompassed "65 regional parks, recreation and wilderness areas, shorelines, preserves and land bank areas totaling approximately 121,000 acres in Contra Costa and Alameda Counties."

The authority of a regional park district to manage the resources on its titled lands – is one that is faced by each Amici, which like EBRPD, "own and steward lands that cross municipal jurisdictions." "The enabling legislature grants extremely broad and all-inclusive powers over the lands that the [d]istrict has acquire[d] and own[ed]" and for which it holds title, and "is essential to each [d]istrict's ability to fulfill its mission and to manage its

---

13      We granted leave and have received a joint Amici Brief in support of EBRPD from the Midpeninsula Regional Open Space District, Santa Clara Valley Open Space Authority, Marin County Open Space District, Monterey Peninsula Regional Park District, and the Napa County Regional Park and Open Space District. Appellants have filed a responsive brief in opposition to the Amici Brief.

resources." Section 5541 authorizes EBRPD to "plan, adopt, lay out, plant, develop, and otherwise improve, extend, control, operate, and maintain a system of public parks, playgrounds, golf courses, beaches, trails, natural areas, ecological and open space preserves, parkways, scenic drives, boulevards, and other facilities for public recreation" (hereafter collectively "recreational recourses"), and "may do all other things necessary or convenient to carry out the purposes of this article." (§ 5541.) This broad grant of authority over recreational resources is subject to one limitation (hereafter section 5541 exception): "The board of directors of a district shall not interfere with control of any of the foregoing or other public property, that are existing, owned or controlled by a municipality or county in the district, except with the consent of the governing body of the municipality, or of the county if the same is in unincorporated territory . . . ." (§ 5541.)

Appellants contend section 5541's exception prohibits EBRPD's interference with all recreational and other public property that is either "owned *or* controlled" by the City of Lafayette, and therefore EBRPD must comply with the city's Tree Protection Ordinance because the city "has elected to control the removal of healthy, mature trees from the District's lands within the City by requiring permits under its Tree Protection Ordinance." We conclude that section 5541's exception is "most logically and plainly read to restrain" a park district from "taking control of locally (city or county) owned, built, or operated parks and recreational facilities" and other public property, located within the geographical boundaries of regional park district, "such as *a city's* public golf course." (Italics added.)

Our interpretation of section 5541's exception is supported by the available legislative history. Before 1963, the second paragraph of section 5541 prohibited park district interference with " 'existing public park,

26

playground, beach, parkway, scenic drive, boulevard, or other public property owned or controlled by a municipality or county in the district,' " and repeated the recreational resources from the first paragraph. "[T]he 1963 amendments added 'golf courses' to the list of recreational resources that a park district could control in the first paragraph," and the second paragraph's repetitive list of recreational resources was replaced with: " 'of the foregoing or other public property, that are existing.' " Therefore, " 'existing' " references the list of recreational resources listed in the first paragraph. The Legislature Counsel's Digest for this 1963 amendment summarizes the relevant amendment as follows: "Provides that a regional park district may exercise powers for recreation purposes among which are golf courses but not limited to such enumerated purposes *but the district is not to interfere with control of existing recreational facilities owned or controlled by municipality or county* except with the consent of the governing body.' " (Italics added.) Thus, the reason for the section 5541 exception appears to be an acknowledgment that as between EBRPD and the cities and counties, EPRPD "has no right to control" recreational resources that are owned or controlled by those local entities. (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1084.)

Appellants do not allege that EBRPD's approval of the MOU was an attempt to regulate recreational resources that are controlled by the City of Lafayette, as mentioned in section 5541's exception. Rather, they argue that the City of Lafayette may interfere with EBRPD's control of its own land, a proposition which is not supported by section 5541's exception. As Amici concisely explained, if section 5541's exception were read as appellants suggest, "it would defeat any purposes behind having separate Parks and Open Space Districts formed under the enabling legislature at all, as, [the

27

Park Districts] would have no authority to 'plan, adopt, lay out, plant, develop, and otherwise, improve, extend, control, operate, and maintain a system of public parks, playgrounds, golf courses, beaches, trails, natural areas, ecological and open space preserves' as prescribed by the first sentence in . . . [section 5541]. That interpretation would be nonsensical and a self-cancelling reading of the statute" that should be rejected. And, as argued by EBRPD, to accept appellants' interpretation of section 5541's exception would mean that "cities and counties must consent to all management decisions affecting all park district [r]ecreational [r]esources since all will necessarily be [geographically located] within either a city or county. . . . This reading would undermine the broad authority given to park districts in [s]ections 5500 et. seq., . . . impermissibly allowing the exception to become the rule." (See *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, 26 [rejecting statutory interpretation where "the exception would swallow the rule"]; *Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1028 ["[w]e avoid an interpretation that renders any portion of the statute superfluous, unnecessary, or a nullity; this is so because we presume that the Legislature does not engage in idle acts"].)

The Legislature, when creating the regional park districts, specifically provided in section 5595: " 'This article[14] shall be liberally construed to promote its objects and to carry out its intent and purposes.' " And, as noted, "the intent of the legislative scheme was to create park districts 'for the purpose of acquiring, improving, and maintaining parks, playgrounds, beaches, parkways, scenic drives, boulevards and other facilities for public

---

[14] "The term 'article' in section 5595 refers to article 3 ('Regional Park, Park and Open Space, and Open-Space Districts') of chapter 3 ('Districts') of division 5 ('Parks and Monuments') of the Public Resources Code." (*Ste. Marie, supra*, 46 Cal.4th at p. 294, fn. 8.)

recreation.' (Stats. 1933, ch. 1043, p. 2664.)" (*Ste. Marie*, *supra*, 46 Cal.4th at p. 294.) To that end the Legislature has also provided in section 5593 that "[a]ll matters and things necessary for the proper administration of the affairs of districts which are not provided for in this article shall be provided for by the board of directors of the district." As noted by Amici, if the Legislature intended to "subordinate" a regional park district's authority to implement land management decisions on its own land to "local regulatory authority," it knew how to do so. For example, when the Legislature created certain special districts governed by the Recreation and Park District Law (§ 5780 et seq.), specific statutory language was provided to mandate that "the district's purpose and function is subordinated to city and county planning ordinances."

We also find compelling Amici's contention that to allow a local jurisdiction to "dictate" how a regional park district is to manage its own lands and resources would render unworkable any district-wide plans. The Legislature expressly provides that a regional park district may encompass more than one city, one county, or one city and county. Section 5502 reads: "(a) Three or more cities, together with any parcel or parcels of city or county territory, whether in the same or different counties, may organize and incorporate. All the territory in the proposed district shall be contiguous. (b) Notwithstanding subdivision (a), one or more cities, together with any parcel or parcels of city or county territory, whether in the same or different counties, the territory of all of which when combined has a population of at least 50,000, may organize and incorporate. All the territory in the proposed district shall be contiguous." By providing for regional park districts encompassing more than one local jurisdiction, "[i]t is apparent that the Legislature did not intend that a county enact legislation controlling

29

activities of a district which extended into another county. If each county, in which there is a portion of the district, should enact legislation purporting to control the activities of the district, it is obvious there would be confusion as to rules and regulations. Likewise, if a city or cities within a district were to enact legislation purporting to control the affairs of the district there would be confusion." (*Baldwin Park County Water Dist. v. County of Los Angeles* (1962) 208 Cal.App.2d 87, 96.)

Thus, we concur with Amici that to accept appellants' argument that EBRPD is subject to the City of Lafayette Tree Protection Ordinance would create a "cross-county or cross-jurisdictional 'checkerboard' problem," with serious practical and policy considerations. As Amici explain, "[t]o date, the lack of precedent on the issue of preemption has led the Districts to rely on long-standing, carefully nurtured relationships between the staff of the respective District and the staff of the municipal jurisdictions that may be feeling pressure to assert authority. The city staff may not be sure if they have jurisdiction at all, and will often work cooperatively with the District Staff to come to an agreement about the substance, with or without granting a permit. [¶] With hard work and good faith, in the context of long-term staff-to-staff relationships, this often works. Where there is, however, city or county staff turnover, local disagreement, or a strong opinion locally about specific resource management decisions, there can be significant delay, cost and uncertainty added to the process of resource management by individual Districts navigating this minefield."

In reply, appellants contend their challenge to the removal of the trees on EBRPD's land "has nothing to do with the *District*'s park management plans" and that we must read their amended pleading as a challenge to the "purely self-interested action by a for-profit corporation" that is acting for its

own purpose to "destroy *the District*'s publicly owned mature and iconic trees greatly enjoyed by *the District*'s recreational users." However, on a demurrer we do not consider appellants' contentions as to their interpretation of the MOU but rather we look at the actual terms of the MOU. The enabling legislation for regional park districts (see, e.g., §§ 5541, 5549, 5594) grants EBRPD broad authority "to manage its own property" including entering into contracts for maintenance services on district land, "whether that decision is embodied in a contract with a private party, in an ordinance, or in some combination of the two." (*Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 871.) While the MOU includes a provision that PG&E will provide a replacement tree for each of 31 EBRPD-owned trees within the City of Lafayette, per the City's ordinance, it is not a concession by EBRPD that its Board of Directors was statutorily mandated to comply with the City of Lafayette Tree Protection Ordinance before approving the MOU with PG&E. Because section 5541's exception does not grant the City of Lafayette the "authority" to control the land owned by the regional park district by prohibiting tree removal on district-owned lands absent a permit, we see no legal significance to appellants' assertion that the city "has elected to control the removal of healthy, mature trees" on the district's land within the city's geographical boundaries "by requiring permits under its Tree Protection Ordinance."[15]

---

[15] In light of our determination that section 5541 preempts the City of Lafayette Tree Protection Ordinance, we do not address appellants' alternative argument, raised for the first time on appeal, that in the absence of preemption EBRPD must comply with the City of Lafayette Tree Protection Ordinance under Government Code section 53091, which requires local agencies to comply with city zoning ordinances in which the territory of the local agency is situated.

31

In sum, we conclude the City of Lafayette Tree Protection Ordinance does not apply to EBRPD's approval of the MOU and the demurrer was properly sustained without leave to amend. "[W]here the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459 (*City of Atascadero*).)

## 2. EBRPD Ordinance 38

The trial court also found the second cause of action's allegations that EBRPD's approval of the MOU violated certain provisions of EBRPD Ordinance 38 (hereafter Ordinance 38) [16] were not sustainable because, as a

---

[16] EBRPD's Board of Directors issued Ordinance 38 as part of EBRPD's " 'Master Plan' " governing management of district land. The ordinance sets forth EBRPD's "land use rules and regulations," including the following pertinent provisions:

"**CHAPTER 1 – DEFINITIONS**:

"**SECTION 100. GENERAL**. Unless the context otherwise requires, the definition hereinafter set forth shall govern the construction of this Ordinance.

"**SECTION 101**. **DISTRICT DEFINED**. 'District' means the East Bay Regional Park District, and includes all lands and waters owned, controlled, or managed by the East Bay Regional Park District, which hereinafter be referred to as 'parklands.'

"**SECTION 102**. **PERSON DEFINED**: 'Person' means any natural person, firm, corporation, club, municipality, district or public agency, and all associations or combinations of person whenever acting for themselves or by any agent, servant or employee."

"**SECTION 103. PERMISSION DEFINED**. "Unless otherwise expressly provided, 'permission' means written permission, granted by the General Manager of the East Bay Regional Park District or the General Manager's designee."

32

matter of law, Ordinance 38 did not apply to actions taken by EBRPD's Board of Directors. Appellants challenge this ruling based on the overarching premise that Ordinance 38, by definition, applies to the actions of EBRPD's Board of Directors. We find appellants' challenge unavailing.

Appellants ask us to consider that Ordinance 38 includes in its definition of the "person[s]" subject to its prohibitions "*any* . . . district or public agency, and . . . any agent . . . or employee," and "[t]he District certainly falls within the plain meaning of 'any district.' " However, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of the statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and the provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation], each sentence must be read not in

"**CHAPTER II - REGULATIONS**
"**SECTION 200. General Regulations**.
"**200.1** All persons entering upon District parkland shall abide by the rules and regulations of the District, the laws of the State of California, and all applicable county and/or municipal ordinances."
"**200.2** The provisions of this Ordinance shall not apply to employees of the District or to the concessionaries or their employees engaged in and acting within the scope of their authorized duties and concession activities or to allied agency emergency personnel in the performance of their official duties. However, District employees and concessionaires and their employees shall abide by the laws of the State of California and all applicable county and/or municipal ordinances (rev. 4/12)."

isolation but in the light of the statutory scheme [citation], and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

Under its enabling legislation in section 5558, EBRPD's Board of Directors is mandated to (a) "superintend, control, and make available to all of the inhabitants of the district, subject to its ordinances, rules, and regulations, all public parks, playgrounds, beaches, parkways, scenic drives, boulevards, open spaces, and other facilities for public recreation belonging to the district or under its control;" (b) "adopt all ordinances, rules, and regulations necessary for the administration, government, protection, and use of the property, improvements, and facilities belonging to the district or under its control"; and (c) "in general, do all acts necessary to the proper execution of the powers and duties granted to, and imposed upon it by this article, and to manage and control the business and affairs of the district." Consistent with this legislative mandate, it is apparent that EBRPD adopted Ordinance 38 to provide rules and regulations for the general public's use of district land, not to govern EBRPD's administration of district land, which is subject to separate "Operating Guidelines," of which we have taken judicial notice. (See fn. 2, *ante.*)

Because Ordinance 38 constitutes the rules and regulations for the general public's use of district land, EBRPD made a concerted effort to provide that Ordinance 38 would not apply to its employees and concessionaires acting in the performance of their duties and included separate definitions for EBRPD and the Board of Directors. While there is no question that, if read literally, the definition of "person" would include EBRPD and its Board of Directors, to so read the language would thwart and

conflict with EBRPD's legislative mandate to maintain its lands under section 5541 and manage and control the business and affairs of the district under section 5558. Another "fundamental rule[] of statutory construction is that a law should not be applied in a manner producing absurd results, because the Legislature is presumed not to intend such results." (*Fireside Bank Cases* (2010) 187 Cal.App.4th 1120, 1129.) Here, appellants' expansive interpretation of "person" could lead to such absurd results. For example, theoretically EBRPD and its Board of Directors, as "persons," could be subject to a lawsuit for a violation of Ordinance 38 when entering into any agreement with a contracting landscaper to perform maintenance on district land that necessitated the removal of any tree, living or dead. We therefore conclude the only reasonable interpretation of EBRPD Ordinance 38 is that it does not apply to EBRPD's actions, undertaken pursuant to its statutory authority – the issuance of Resolution No. 2017-03-065 and the execution of the MOU with PG&E.

Because EBRPD's approval of the MOU was not subject to Ordinance 38, the second cause of action based on a violation of that ordinance does not lie and the demurrer was properly sustained without leave to amend. As we have noted, "where the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result." (*City of Atascadero, supra,* 68 Cal.App.4th at p. 459.) In light of our determination, we decline to address the parties' other contentions.

### D. Dismissal of Third Cause of Action

The amended pleading's third cause of action seeks relief based on allegations that appellants were not given adequate notice and an opportunity to be heard before EBRPD approved the MOU, thereby violating

appellants' due process rights under the California Constitution, article I, section 7.  This cause of action is premised on the theory that certain land use decisions may have such a significant impact on nearby property owners so as to constitute a deprivation of property rights in violation of the Due Process Clause in the California Constitution, thereby entitling appellants to adequate notice and an opportunity to be heard.

The trial court dismissed this cause of action on the basis that appellants did not state a claim for a violation of their constitutional due process rights because the pleading failed to allege a general rezoning or governmental deprivation of a significant or substantial property interest.  In denying appellants' motion to vacate the judgment, the trial court expanded on its reasons for dismissal, stating, in pertinent part, that appellants had "offered little support" for their conclusion that EBRPD's approval of the MOU was an adjudicatory approval subject to "due process principles."

On appeal, appellants contend EBRPD's approval of the MOU is "adjudicative" in nature, thereby triggering constitutional due process protections of notice and hearing under *Horn v. County of Ventura* (1979) 24 Cal.3d 605 (*Horn*), *Scott v. City of Indian Wells* (1972) 6 Cal.3d 541 (*Scott*), and *Calvert v. County of Yuba* (2006) 145 Cal.App.4th 613 (*Calvert*).  We see no merit to the contention and a rendition of the facts in *Horn*, *Scott*, and *Calvert*, demonstrates why they are clearly inapposite to the case before us.

At issue in *Horn* was a county's approval of the proposed division of a property into lots.  (24 Cal.3d at p. 610.)  The plaintiff alleged that some of the proposed subdivided lots were "topographically unsuited for residential construction, that the design of the subdivision will hinder access to plaintiff's property thereby creating substantial traffic and parking congestion, and that the county's environmental assessment of the project is

36

inadequate." (*Id.* at p. 611.) Our Supreme Court found that because approval of the subdivision constituted a " 'quasi-adjudicatory' " act of local government, those persons affected by such a land use decision were constitutionally entitled to notice and an opportunity to be heard prior to the final decision. (*Id.* at p. 612.) *Scott* similarly involved an action seeking to void the grant of a conditional use permit allowing construction of a large, planned development on land lying just within the city limits; the plaintiffs and the class they represented owned neighboring land lying just outside the city limits. (6 Cal.3d at p. 544.) Because of the clear administrative and adjudicatory nature of the use permit procedure, both statutory and constitutional provisions called for notice and hearing of adjoining landowners who resided in the city. (*Id.* at pp. 548-549.) The only question was whether the city also had to give notice and hearing to similarly situated adjoining landowners who lived outside the city boundaries, which was answered in the affirmative. (*Id.* at p. 549.) Finally, *Calvert* was in regard to a county's approval of a mining operator's request for a "vested rights" determination allowing the right to mine " 'aggregate' (sand, gravel and rock for construction) from approximately 3,430 acres" in the 10,000 acres of the "Yuba Goldfields." (145 Cal.App.4th at p. 618.) The petitioners were found to be constitutionally entitled to notice and hearing as the administrative procedure for a "vested rights" determination was similar to the basic procedure for determination of a surface mining permit, which was concededly " 'adjudicatory in nature and therefore subject to notice and hearing requirements.' " (*Id.* at pp. 625-626.) Unlike the situations in *Horn*, *Scott*, and *Calvert*, concerning "government conduct . . . *affecting the relatively few*" (*Horn*, *supra*, 24 Cal.3d at p. 614; italics added), we are here concerned with what are "unquestionably" quasi-legislative acts, to which

37

due process requirements of notice and hearing do not apply. (*San Diego Bldg. Contractors Assn. v. City Council* (1974) 13 Cal.3d 205, 207, 211 (*San Diego Bldg. Contractors*).)

When EBRPD's Board of Directors held a public hearing, issued its Resolution No. 2017-03-065 and entered into the MOU with PG&E, it was acting under both its expansive statutory authority to control and manage district-owned lands (§§ 5541, 5558), and its legislative authority to "determine all questions of policy" (§§ 5537, 5547). "Fundamental to this conclusion is the proposition that legislative action encompasses more than law-making, [because in considering PG&E's funding request] the board of directors plainly was not enacting legislation. But quasi-legislative bodies, like the Legislature itself, do far more than their primary function of law[-]making. . . . For example, they appropriate and borrow money for public purposes [citation], they decide when and where the power of eminent domain is to be exercised [citation], [and] they decide whether various civic improvements are to be made [citation]." (*Wilson v. Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 278 (*Wilson*).) Thus, the fact that EBRPD's Board of Directors "was not enacting ordinances embodying rules and regulations does not make its actions any less quasi-legislative." (*Id.* at p. 279)

Additionally, the quasi-legislative nature of the actions of EBRPD's Board of Directors is not impacted by the fact that "the procedure used by the board of directors in arriving at its decision embodied characteristics of the judicial [or an adjudicative-like] process." (*Wilson, supra*, 256 Cal.App.2d at p. 279.) "Legislative bodies often act in response to specific petitions and with regard to specific parties. [Citations.] [And, like courts, a] Legislature . . . exercising quasi-legislative powers commonly resort[s] to the hearing

38

procedure to uncover, at least in part, the facts necessary to arrive at a sound and fair legislative decision." (*Ibid*.) "Generally speaking, a hearing on a legislative matter is held for the purpose of informing the law makers regarding relevant facts and policy considerations; it is not held for the protection of individual rights, property or otherwise." (*Bayless v. Limber* (1972) 26 Cal.App.3d 463, 470; see *San Diego Bldg. Contractors, supra,* 13 Cal.3d at pp. 207, 211-212 [zoning ordinance establishing a uniform height limitation for buildings along the city's coastline was "unquestionably a general legislative act," to which "due process requirements of notice and a hearing did not apply," even though it might well be anticipated that the ordinance would deprive persons of "significant property interests"]; *Quinchard v. Board of Trustees of Alameda* (1896) 113 Cal. 664, 669-670 ["whether an existing street shall be improved . . . is a question to be addressed to the governing body of a municipality in its legislative capacity, and its determination upon that question, as well as the character of the improvement to be made, is a legislative act"; "[t]he act does not cease to be legislative because the members of the city council are required to exercise their judgment in determining whether the improvements should be made, . . . but is the conclusion or opinion which they form in the exercise of the discretionary power that has been [entrusted] to them, and upon a consideration of the public welfare and demands for which they are to provide"]; *Joint Council of Interns & Residents v. Board of Supervisors* (1989) 210 Cal.App.3d 1202, 1207, 1211 [board of supervisor's approval of contract for employment of intern and residents at county facilities was legislative, not adjudicatory, act; "the ultimate question of whether the contract should be executed was a political one shaped by discretion and public policy"; " 'the award of a contract, and all of the acts leading up to the award, are

legislative in character' "]; *Duran v. Cassidy* (1972) 28 Cal.App.3d 574, 581-582 [city council's decision to build and operate golf course in a public park was "essentially legislative in nature" as decision to enter into golf course business was a "policy decision"].)

We find both instructive and dispositive the case of *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735 (*Oceanside Marina Towers*). In *Oceanside Marina Towers*, the plaintiff Oceanside Marina Towers Association (Association) challenged a CEQA negative declaration of environmental impact issued by the Oceanside Community Development Commission (Commission) and the City of Oceanside (City). (*Id.* at pp. 737-738.) "Members of the Association own[ed] and occup[ied] the Marina Towers Luxury Condominiums which [were] located near the proposed site of a relocated railroad switchyard. The relocation of the switchyard from its current site in downtown Oceanside to the proposed site on the outskirts of the city [was] a central element in the Commission's downtown redevelopment plan. It [was] the Association's position that the Commission and the City failed to adequately consider the adverse environmental impact which the relocated switchyard would have on Marina Towers." (*Id.* at p. 738.) In dismissing the Association's cause of action based "on the theory articulated in" *Horn, supra,* 24 Cal.3d 605, the *Oceanside* court reasoned as follows: "In the present case . . . the Commission and the City are called upon to consider the interests of nearby property owners such as the Association as well as those of property owners and businesses in the downtown area who would be benefited by the removal of the switchyard, area residents whose access to the downtown area and beaches would be improved, and motorists who would benefit from reduced traffic congestion. Indirect community factors must also be evaluated such as

the increased tax base a rejuvenated downtown business district might create.  In sum, the relocation of the switchyard, like any other decision regarding the location of a public improvement, requires the assessment of a broad spectrum of community costs and benefits which cannot be limited to 'facts peculiar to the individual case.' " (*Oceanside Marina Towers*, *supra*, at pp. 746-747, quoting in part, *San Diego Bldg. Contractors*, *supra*, 13 Cal.3d at p. 212.)

So, too, in this case, the actions of EBRPD's Board of Directors — holding its March 21, 2017, public hearing, issuing its Resolution No. 2017-03-065, and entering into the MOU with PG&E — were all quasi-legislative actions, not quasi-adjudicatory ones.  The Board of Directors' decisions were not limited to a consideration of the interests of nearby property owners such as the individual appellants or appellant Save Lafayette Trees and its members.  Instead, the Board of Directors was tasked with considering PG&E's funding request in the context of how the proposed tree removal and replacement and future maintenance operations would impact EBRPD's " 'Core Mission,' " to " 'maintain a high quality of diverse system of interconnected parklands which balances public usage . . . with protection and preservation of our natural and cultural resources.' "  The removal of the 245 trees as part of the approved project, "like any other decision regarding" the maintenance of district land, required the Board of Directors to assess "a broad spectrum of community costs and benefits which cannot be limited to 'facts peculiar to the individual case.' " (*Oceanside Marina Towers*, *supra*, 187 Cal.App.3d at p. 747, quoting in part, *San Diego Bldg. Contractors*, *supra*, 13 Cal.3d at p. 212.)

Accordingly, the demurrer to the third cause of action was properly sustained without leave to amend as no amendment could change the fact

that EBRPD's March 21, 2017 public hearing, the approval of Resolution No. 2017-03-065, and the execution of the MOU with PG&E, were all quasi-legislative acts to which constitutional due process rights of notice and hearing were inapplicable. Having determined that constitutional due process rights of notice and a hearing did not attach to EBRPD's quasi-legislative acts, we are not required and do not determine whether the amended pleading sufficiently alleges or could be amended to sufficiently allege that appellants suffered a substantial or significant deprivation of property rights.

## DISPOSITION

The judgment of dismissal and order denying the motion to vacate judgment are affirmed. Respondents East Bay Regional Park District and Pacific Gas and Electric Company are awarded their costs on appeal.

_____
Petrou, Acting P.J.

WE CONCUR:


_____
Jackson, J.


_____
Wiseman J.*


*A156150*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

43

Trial Court:        Contra Costa County Superior Court

Trial Judge:        Hon. Steven K Austin

Counsel:            Law Offices of Stephen C. Volker, Stephan C. Volker,
                    Alexis E. Krieg, Stephanie L. Clarke, and Jamey M.B.
                    Volker for Petitioners and Appellants.

                    Shute, Mihaly & Weinberger, Tamara S. Galanter and
                    Caitlin F. Brown; East Bay Regional Park District, Carol R.
                    Victor and Rachel B. Sater, for Defendant and Respondent.

                    SF North Bay Law, Sheryl L. Schaffner as Amicus Curiae
                    on behalf of Defendant and Respondent.

                    Miller Starr Regalia, Arthur F. Coon and George B. Speir,
                    for Real Part in Interest and Respondent.